DENNIS HARRILL v. SINCLAIR REFINING COMPANY AND MORGAN P. BODIE.

(Filed 26 September, 1945.)

1. Landlord and Tenant § 10—

Ordinarily at common law, in the absence of an agreement relating to repairs or warranty relating to the condition of the property when leased, the lessee takes it in its then existing condition, and the landlord is under no obligation to restore or make repairs to premises where defects have been caused by decay or use, or which have arisen after the date of lease or occupancy, or which existed at the time of the demise.

2. Same—

The burden is on the lessee to show that the lessor contracted to make repairs.

3. Landlord and Tenant § 11—

Even when a lessor in his lease assumed the duty of making repairs, a breach of that duty would not ordinarily give rise to a cause of action in tort for personal injuries to the lessee.

4. Same—

In a tort action by lessee against lessor for injuries caused by defects in the leased premises, ordinarily the doctrine of *caveat emptor* applies. To avoid this doctrine, the lessee must show that there is a latent defect

known to the lessor, or which he should have known, involving a menace or danger, and a defect of which the lessee was unaware or could not, by the exercise of ordinary diligence, discover, the concealment of which would be an act of bad faith on the part of the lessor.

**5. Same—**

A *latent defect* in leased premises, for which the lessor may be liable in tort to the lessee, refers to a *physical defect* and not a latent potentiality of injury from a patent physical condition, or to mere consequences unknown, unexpected or unpredictable to the parties. Two rules are deducible from this distinction: First, to render the lessor liable for an injury on the theory of concealment, the latent defect which it is his duty to disclose must be of such a nature as to give warning to an ordinarily prudent person that injury might result as a natural and probable consequence in the use of the demised premises; and second, where the supposed defect or defective condition itself is patent, and the parties have an equal opportunity of inspection, no liability in tort can be imputed to the lessor with respect to it.

**6. Same: Negligence § 19a—**

In a civil action to recover damages by plaintiff, lessee, against defendant, lessor, for personal injuries allegedly caused by defects in the leased premises, where plaintiff's evidence tended to show that the injuries resulted from defects in an overhead slide type door, running on a track and operated by springs and cables over pulleys, that one cable was off the pulley, and there were insufficient brackets to hold the track, causing the track to spread, that these defective conditions were in plain sight of plaintiff when the premises were let to him and he had been operating the door for some time prior thereto, there is insufficient evidence for the jury and judgment as of nonsuit was proper.

APPEAL by plaintiff from *Warlick, J.,* at April Term, 1945, of RUTHERFORD.

Action to recover damages for personal injury arising out of defects in leased premises.

The corporate defendant was the owner of a filling station in Forest City, North Carolina, which was being operated under a lease of the defendant to a partnership doing business as "Oates Motor Co." The co-defendant, Bodie, was distributing agent for the Refining Company's products in that area. Plaintiff operated the station for Oates Motor Company for a year or more, until the death of one of the partners, and the premises were then sublet to him by the surviving partner, with the consent of the Refining Company. Since the filling station was exclusively an outlet for the Refining Company's products, the rental was one cent per gallon upon the gasoline purchased, and the plaintiff continued to pay this ordinarily in cash upon delivery of the gasoline to the filling station. After his accident and injury, he made out checks for bills directly to the Sinclair Refining Company.

Some time after the plaintiff went into possession of the premises, a door to the wash rack, through which cars were admitted for washing, became hard to operate, and later required the efforts of several men to push it up and down. The plaintiff testified that in early July, he reported to Mr. Bodie, to whom he refers as agent of the defendant, that the door was "hard to push up and down." In a letter written to the Refining Company shortly after the accident, the plaintiff stated:

"This door had not been operating properly for some time prior to the accident, and this defect was reported to your local agent, Mr. M. P. Bodie, immediately after it was discovered. The repair was not made, although I continued to report the condition." When the question of repairs was mentioned to Mr. Bodie early in July, Bodie told plaintiff to get Mr. Neal to come and check the door. Plaintiff got Neal to come up, and Bodie told plaintiff he could not authorize more than $5.00 until he got the figures. "Mr. Neal told me what it would cost to fix it, and I told him to go and see Mr. Bodie, and I didn't hear anything more about it. That must have been about the middle of August."

The door mentioned was of the overhead slide type, consisting of four hinged sections, which, upon being pushed up, slide into and along a supporting overhead track. The weight of the door was counterbalanced by springs on each side, connected with the door by cables running over pulleys, making the door normally easy to operate with one hand. The plaintiff testified: "I knew the cable was off the door and something wrong with it. . . . Up until about five weeks before I was injured I pushed it up with one hand."

On the occasion of the accident, the door was being pushed up by the plaintiff and three other men in the service station, the plaintiff standing on the inside of the door. "I believe four of us were raising the door at the time. It was rather heavy. A cable had been broken. You could pull the door up with the cable. The door was connected with a spring and the cable was connected with the spring, and when the cable was broken the spring would not work."

When the door had been pushed up about waist high, it fell upon plaintiff, seriously injuring him.

L. A. Magness testified:

"I am a builder. I was in charge of the construction of the station for Mr. Weathers. Weathers and Davis were building it. I put the door up according to the blueprints. That door was approved and was an accepted overhead door of that kind. When I left it it was in good working condition. I built it according to the blueprint and put the brackets on it."

He further testified that there should have been more brackets. That in his opinion the door fell because there were not enough brackets and the track spread.

C. P. Neal testified:

"When I examined the door over the wash rack, before the accident, it did not have all the brackets shown on the blueprint handed me. I told Mr. Bodie some of the brackets were gone and some of the guide ropes were gone. . . . I found that five of the brackets at the end of the track were gone. . . . One cable being on and one off would throw the door in a twist. That would have a tendency to make it loose on one side. Four men pushing on the door in any shape would have a tendency to push it off. The guide did not have much pressure on it. It was just a guide. When it is in proper condition you can push it up with one hand. If one cable were gone that would push to the side."

He gave it as his opinion that the track spread because there were not enough brackets.

He further testified that it was "not standard use" for those doors to have five brackets gone, but did not know how many brackets were there when the station was built or the lease made.

Upon defendant's motion, at the conclusion of plaintiff's evidence, the court entered a judgment as of nonsuit, and plaintiff appealed.

*C. O. Ridings, Tillett & Campbell, and Hamrick & Hamrick for plaintiff, appellant.*

*J. S. Dockery and O. J. Mooneyham for defendants, appellees.*

SEAWELL, J. Without prejudice to the appellant, we may refrain from discussing any distinction in the reciprocal duties of the parties which might arise from the fact that plaintiff was a sub-tenant of Oates Motor Company; and may assume that the more direct relation of landlord and tenant existed between the parties *ab initio.*

The common law applies in this jurisdiction on the general subject of repairs between landlord and tenant. Ordinarily, in the absence of an agreement relating to repairs or warranty relating to the condition of the property when leased, the lessee takes it in its then existing condition, and the landlord is under no obligation to restore or make repairs to premises where defects have been caused by decay or use, or which have arisen after the date of lease or occupancy, or which existed at the time of the demise. *Duffy v. Hartsfield,* 180 N. C., 151, 104 S. E., 139; *Jordan v. Miller,* 179 N. C., 73, 101 S. E., 550; *Smithfield Improvement Co. v. Coley-Bardin,* 156 N. C., 255, 72 S. E., 312; *Gaither v. Hascall-Richards Steam Generator Co.,* 121 N. C., 384, 28 S. E., 546; 36 C. J.,

p. 43, attention to Note 58; *id.*, p. 125, s. 766 (D); *id.*, p. 44; 32 Am. Jur., Landlord and Tenant, ss. 662, 657. In the case before us it does not appear that the lessor contracted to make any repairs under any circumstances, and since the burden was upon upon the plaintiff to show otherwise, if necessary, it must be assumed that the contract is negative in that respect.

However, even had the lessor in his lease assumed the duty of making repairs, a breach of that duty would not ordinarily give rise to a cause of action in tort for personal injury to the lessee. *Leavitt v. Rental Co.,* 222 N. C., 81, 82, 21 S. E. (2d), 890; see quotation from *Jordan v. Miller, supra,* on p. 82. *Mercer v. Williams,* 210 N. C., 456, 187 S. E., 556.

Ordinarily, the doctrine of *caveat emptor* applies to the lessee; *Gaither v. Hascall-Richards Steam Generator Co., supra; Hudson v. Silk Co.,* 185 N. C., 342, 117 S. E., 165; *Fields v. Ogburn,* 178 N. C., 407, 100 S. E., 583. To avoid foreclosure under this doctrine in an action for tortious injury, he must show that there is a latent defect known to the lessor, or which he should have known, involving a menace or danger, and a defect of which the lessee was unaware or could not, by the exercise of ordinary diligence, discover, the concealment of which would be an act of bad faith on the part of the lessor. "If the landlord is without knowledge at the time of the letting of any dangerous defect in the premises, he is not responsible for any injuries which result from such defect." *Covington v. Masonic Temple Co.,* 176 Ky., 729, 197 S. E., 420. And he is not liable if he did not believe or suspect that there was any physical condition involving danger. *Charlton v. Brunelle,* 82 N. H., 100, 130 A., 216, 43 A. L. R., 1281.

Plaintiff's appeal poses the single question: Whether, under the facts of this case, the plaintiff has brought himself within the narrow exception to the general principles of law applicable to his case, as above outlined.

In considering that question, we should keep in mind that within these rules a *latent defect* refers to a *physical defect* and not a latent potentiality of injury from a patent physical condition, or to mere consequences unknown, unexpected or unpredictable to the parties. Such consequences are always latent until they develop, or crop out, in experience. Two rules are deducible from this distinction which deserve to be brought into the clear: First, to render the lessor liable for an injury on the theory of concealment, the latent defect which it is his duty to disclose must be of such a nature as to give warning to an ordinarily prudent person that injury might result as a natural and probable consequence in the use of the demised premises; and second, where the sup-

posed defect or defective condition itself is *patent,* and the parties have an equal opportunity of inspection, no liability in tort can be imputed to the lessor with respect to it. 36 C. J., p. 205, s. 875; 32 Am. Jur., Landlord and Tenant, s. 662, *supra.*

It appears from the evidence that the wash door track and the brackets holding it were in plain sight of the plaintiff at the time the premises were sublet to him. In fact, for the year or more while he was in the employment of Oates Motor Company, he operated this door with apparent satisfaction and continued to do so after he took over the premises. He had, therefore, an equal opportunity with the defendant to observe the alleged defect, if any.

In support of the theory of liability based on the failure of defendant to disclose a supposedly dangerous latent defect, the *dernier resort* for recovery in a case of this kind, plaintiff stresses the testimony of Magness and Neal. But in speaking of the insufficiency of the brackets to prevent the track from spreading, it is conjectual whether they referred to normal operations, or the abnormal lateral strain placed upon the door and track by the breaking of a cable on·one side, and the want of a counterbalance—a defect which, according to the evidence, developed long after the original construction and after plaintiff went into occupation of the premises. This, however, is not important to the result. Taking the evidence as a whole, and in the light most favorable to the plaintiff, it fails to bring home to the corporate defendant a knowledge, at the time of the lease, of any defective condition calculated to put it on notice that injury might at any time result from the use of the track. We can find no phase of the evidence upon which the plaintiff is entitled to recover.

There is no evidence of any liability on the part of the defendant Bodie.

The judgment dismissing the action as of nonsuit is
Affirmed.