[No. 32146. *En Banc.* May 5, 1953.]

ROBERT O. REEDER *et al.*, *Respondents*, v. WESTERN GAS &
POWER COMPANY *et al.*, *Appellants.*[1]

[1]Reported in 256 P. (2d) 825.

*Velikanje & Velikanje* and *John S. Moore, Jr.,* for appellants.

*Ned W. Kimball, C. M. Clark,* and *Joseph P. Tully,* for respondents.

*Graves, Kizer & Graves, amicus curiae.*

FINLEY, J.—Robert and Lucile Reeder, husband and wife, instituted this action to recover for personal injuries sustained by Lucile Reeder and for property damage to their home. The complaint alleged that an explosion which occurred was due to the negligence of defendants in the installation of a propane gas system and to a breach of defendants' contractual duty to provide a safe installation. The case was presented to the court, without a jury. Judgment was rendered for plaintiffs, and defendants have appealed.

The relevant facts are: Plaintiffs, who recently had moved from California to Bridgeport, Washington, wished to have a propane gas system installed in their home. They had brought a gas kitchen stove with them from California. There it had been operated with natural gas. Mr. Reeder went to the Western Gas & Power Company and asked the agent of the company, Mr. Archie Elliott (one of the defendants in the present case), if the stove could be converted to the use of propane gas. Elliott told Reeder that the stove could be used or operated with propane gas, but that the size of the burner orifices would have to be reduced to achieve satisfactory combustion of the propane gas.

On this initial visit, Reeder advised Elliott that he had a

piece of tubing or gas pipe which had come with the stove. He did not mention whether this pipe was long enough to fit the projected installation. The evidence is conflicting as to what then transpired at this initial meeting. Reeder claims that Elliott asked him to run the pipe from the kitchen stove through the outside wall of the house, at which point Elliott would then connect an outside propane gas tank. When he was called as an adverse witness, Elliott could not recall specifically whether he had asked Reeder to run the pipe through the wall or whether Reeder merely had volunteered to do this.

On returning home, Reeder began installation of the pipe. He found that the pipe, which was made of aluminum, was too short to reach from the stove to the outside of the house. He secured another section of pipe, with an attached nipple, from a Bridgeport hardware store. The new section was made of copper. Reeder coupled these two sections of pipe together. He then attached the aluminum end to the stove, ran the pipe through a sink cabinet adjacent to the stove, and ran the copper end of the coupled-pipe sections through the outside wall of the house. Upon the completion of the installation, the coupling between the sections of pipe could be seen only by opening the door to the sink cabinet and looking inside.

A few days later, Elliott arrived to install the propane gas system. He connected the outside tank to the copper section of the pipe which protruded from the wall. He then went inside the house, checked the stove, and began changing the orifices on the burners. Apparently, he applied a film of oil to the connection which he had made between the tank and the outside copper section of pipe, and also to the connection which Reeder had made of the aluminum pipe to the stove. No gas bubbles appeared through the oil film, and Elliott concluded the particular connections were properly made. Admittedly, no one specifically advised Elliott of the coupling between the two sections, which was hidden from view within the sink cabinet.

While Mr. Elliott was working on the stove, Mrs. Reeder came in from an adjoining room to tell him *she smelled gas.*

She asked him if the odor would continue, and he assured her that it would not. On trial, Elliott testified that this odor of which Mrs. Reeder complained could have ·come from two sources: (1) from his clothing, which was permeated with a malodorant placed in the gas to warn users of escaping gas; or (2) from the raw gas which Elliott let into the room while he was checking the burners, since, in changing the orifices, *a small amount* of gas was allowed to run through them before they were tested by being lighted. A third possible source of the odor could have been gas escaping from the defective coupling under the sink cabinet, but appellants deny that this was the source of the odor, because the cabinet was tightly closed, and the gas, being heavier than air, would not rise. ·

After converting the stove to accommodate propane gas, Mr. Elliott had Mrs. Reeder sign an installation and service agreement, referred to in more detail subsequently herein. Mrs. Reeder paid him for the installation and Elliott left.

Mrs. Reeder left the house for a few minutes and then returned. The odor of gas was strong, and she opened the front and back doors of the house to create a clearing draft of air. In less than an hour after the installation had been completed, Mrs. Reeder opened the cabinet sink door to reach for some washing powder. As she opened the door, an explosion occurred for some unexplained reason. She was thrown backward forcibly and received flash burns on her arms and face. Substantial damages were done to the interior of the kitchen. Shortly thereafter, the assistant fire chief of Bridgeport arrived, and, while he was there, Mr. Elliott returned. They began an inspection of the premises to determine the cause of the explosion. The inspection revealed a defect in the coupling between the copper and aluminum sections of the pipe. The leak was *so pronounced that it could be located by the hissing sound made by the escaping gas.*

The trial judge made fact findings, reciting in substance the evidentiary facts recounted above. He also found (1) that, although Elliott had no actual notice of the defective

coupling Reeder had made, if he had checked he would have discovered the defect; (2) that, when the tank was installed, there was no "existing system" in the Reeder home, and that the Reeders expected the defendants to install a safe system, and that a safe system would include all equipment and parts necessary to transport gas safely from the tank to the stove. The court found that Elliott was negligent in making the installation, in that he failed to inspect the pipe leading from the tank to the stove after he had been put on actual notice that gas was escaping, and that he breached his contractual duty to install properly the system for safe use.

We shall now discuss those assignments of error which attack the findings of the court relating to negligence. As to whether the defendants are liable on the basis of negligence, the ultimate question is whether defendant Elliott had imposed upon him, by the facts and circumstances of the case, a duty to inspect the pipe line—particularly, after being put on notice by Mrs. Reeder's complaint regarding the odor of escaping gas. In other words, the question is whether the facts might have suggested to a reasonable man the necessity for checking the pipe line before leaving the premises with the tank connected and the gas pressure turned into the installation.

Appellants contend that, in so far as the imposition of tort liability is concerned, this appeal is governed by *Moran Junior College v. Standard Oil Co.*, 184 Wash. 543, 52 P. (2d) 342, and that by the rule of the *Moran* case there was no duty to inspect. The respondents, on the other hand, say that the *Moran* case, on its facts, is clearly distinguishable from the case at bar; that, given the facts of the case at bar, a duty to inspect for leaks did arise. These contentions necessitate a closer analysis of the *Moran* case, both as to its facts and as to the decision made therein.

In the *Moran* case, the plaintiff college had built a science laboratory in the basement of a building. One end of the original basement floor was about a foot lower than the other. A level floor was constructed over the original one. The gas pipes and other utility conduits were laid beneath

the new floor. A layer of concrete was placed above them. It appears that this installation work was done by Mr. Squance, the college maintenance engineer or handy-man. Plaintiff college then applied for installation of a Flamo gas system. When defendant's agent called, he was assured by Mr. Squance that the piping under the floor was new and was sealed with white lead. Defendant's agent recommended the use of piping larger than that installed, but, because of the expense which would be entailed in ripping up the floor, it was decided to use the piping as laid.

When a preliminary check of the system was made by lighting some burners, Mr. Ward, a chemistry teacher in the school, stated that, because of the irregular size of the flame, there might be a leak. The gas, which had been on for about an hour, was turned off, and the closet in which the cut-off valves were located was locked. A number of complaints were made to the defendant company, and finally an admittedly inexperienced man arrived to investigate. A drop in the gas pressure gage indicated there was a leak somewhere in the line, so the valves were again shut off and the closet locked. Later in the day, Mr. Ward obtained the closet keys from Mr. Squance and ran gas into the system for about fifteen minutes, ostensibly to show his science class how weak the pressure was. A few hours later, an explosion occurred. Plaintiff college instituted an action predicated on defendant's negligence in installing the system, but was nonsuited at the end of its case. On appeal, we affirmed the judgment of dismissal.

 In our decision, we announced several rules which are applicable here. We noted first that illuminating gas is a dangerous substance, and that the degree of care to be exercised in its use should be commensurate with its harmful nature. We assumed, without deciding, that Flamo, a tank gas, might be considered as comparable to illuminating gas. We then held that the case was governed by the generally accepted rule, which we stated to be as follows (p. 552):

"If the gas pipes and fittings are the property of the consumer and there is no contractual duty resting on the gas

company to inspect, the consumer, by application for gas service, assumes the burden of inspecting and maintaining the pipes and fittings on his premises in a manner reasonably suited to meet the required service, and the company has the right to assume that these duties have been performed by the applicant."

■ Where the explosion is caused by a defect in the customer's pipes, there can be no doubt that this is the general rule. See 25 A. L. R. 262, 272-274; 47 A. L. R. 488, 490-1; 138 A. L. R. 870, 883-892; 24 Am. Jur. "Gas Companies," 686-7, § 32; 38 C. J. S. "Gas," 735-8, § 42 (d). But an important qualification to the general rule is that, if the company making the installation has actual or constructive knowledge of leaks in the system, then a duty to inspect may arise. This qualification to the general rule is stated in 25 A. L. R. 272, as follows:

"While a gas company is not required to examine or inspect the plumbing or pipes belonging to the owner of a building to which it furnishes gas, yet it has been held that if the company knows at the time it turns on the gas, or *after turning on the gas becomes aware*, that there are defects in the pipes, *or is in possession of facts that would suggest to a person of ordinary care and prudence that the pipes in the building are leaking, or are otherwise unsafe for the transportation of gas, it then becomes the duty* of *the company* to make such an inspection or investigation as *a person of ordinary care and prudence, similarly situated, and handling such dangerous agency, would make to ascertain the safety of the pipes before it furnishes, or continues to furnish, gas through them; and, failing so to do, if it furnishes, or continues to furnish, gas through the pipes, it does so at its own risk, and becomes liable for an injury resulting therefrom* to any person in the building, who is without fault. *Southern Indiana Gas Co. v. Tyner* (Ind.), *supra*. See to the same effect, *Bell v. Brooklyn Union Gas Co.* (1920) 193 App. Div. 669, 184 N. Y. Supp. 807; *Lennon v. Union Gas & E. Co.* (1915) 4 Ohio App. 153, 32 Ohio C. C. N. S. 247." (Italics ours.)

To the same effect, see 24 Am. Jur. "Gas Companies," 686-7, § 32; 38 C. J. S. "Gas," 735-38, § 42 (d).

Our own decision in the *Moran* case, *supra*, recognizes that in appropriate circumstances a duty to inspect the

piping put in by a customer may be in order, once one has constructive or actual knowledge of a leak. Although we applied the general rule noted heretofore and refused to apply the exception thereto, because the defendant gas company had no notice of defects, we clearly implied that given such notice of defects, a different result might accrue. In *Moran, supra,* at p. 552, we said:

"The company, having had no notice that the pipes were in defective condition on the customer's own premises, had the right to assume, *in the absence of such notice,* that the owner of the building had seen to it that the pipes were in proper repair and that the gas could not escape therefrom." (Italics ours.)

It is readily apparent that any duty to inspect, under the law of negligence, must rest on constructive knowledge which Elliott might have had of the defective coupling or of a leak in the gas line. While all parties concede that Elliott had no actual notice of the coupling, it is further conceded that the coupling was readily discoverable. The only question is whether, under the circumstances, there was a duty to look for it.

Parenthetically, we note that the mere fact that the coupling was readily discoverable does not of itself impose a duty of inspection, although it might be one circumstance to be considered by the trier of fact in determining whether Elliott exercised reasonable care under all facts and circumstances of the case. Ultimately, the duty of inspection must rest on knowledge or on the means of knowledge which Elliott had.

Whether Elliott had constructive knowledge of the defective coupling so as to have imposed on him a duty of inspection, depends essentially on whether the situation confronting him at the time of his acts or omissions was such as would, to a reasonable man, suggest investigation and inspection in order that readily discoverable dangers might appear. 38 Am. Jur. "Negligence," 667, § 24. And in this connection, it must be remembered that, once it is made to appear by the circumstances of the case that an inspection might reasonably be in order, the question of

liability does not turn on a mechanical invocation of the general rule that there is no duty to inspect where the defect is one appearing in the customer's own pipes. Given circumstances suggesting the need for inspection, the question of liability is generally determined with reference to the particular facts of the case at hand. The question is a factual one for the trier of fact to determine. 24 Am. Jur. "Gas Companies," 686, § 32.

Here we note that two important circumstances were sufficient to call to Elliott's attention the existence of the coupling or leak in the system: (a) the complaint Mrs. Reeder made of the odor of gas, and (b) the dissimilarity in metals at the two ends of the pipe. While it might be that the source of the odor of which Mrs. Reeder complained was not the defective coupling, still, in the light of the high degree of care which is to be exercised when working with a dangerous and explosive substance such as inflammable gas, we think there is much to be said for the viewpoint of the trial judge that Elliott was not justified in relying on his belief that the odor came from either his clothing or from the burners. As to the different metals from which the two sections of pipe were made, Elliott himself admitted that he had never seen a pipe installation (like the one in question) without a connection or joint somewhere therein. It was sufficient notice to him that a coupling existed somewhere. This, taken with the complaint of an odor of gas, was sufficient notice to suggest the need for investigation.

Given the conflicting inferences to be drawn from the facts as to whether Elliott had constructive notice of the leak, it cannot be said that the trial court erred in its findings in this respect, and we will not overturn them. Since we think the *Moran* case is clearly distinguishable from the one at bar, the two can stand side by side. In the case at bar, the defect was readily discoverable once notice was had of a leak in the system; on the other hand, in the *Moran* case, it would have been necessary to tear up a concrete floor to check the piping.

We now briefly consider whether there was a contractual liability to inspect. The "Better Heat Installation and Service Agreement" between the parties provided that the tanks, pipes, and fittings should be under the sole control of the customer but that, if the company learns the appliances or pipes are unsafe, it reserves the right to refuse deliveries. The contract then provides:

"The Company, however, shall have no duty to inspect such equipment or to stop deliveries because of faulty equipment or appliances or the negligent use thereof by the Customer."

We note appellants' contentions that this is a valid agreement between the parties, negating *any* duty at all to inspect. It is interesting that in effect, this contractual provision limiting the duty to inspect is analogous to the general rule discussed above, *i.e.*, absent knowledge of defects, a gas company is under no duty to inspect the customer's pipes for defects. Unquestionably, the contractual provision is valid to this extent, for it does no more than express the general rule. But we believe it would be unreasonable and against public policy to approve such a contractual limitation on the duty to inspect in cases where the facts themselves suggest a duty to inspect. Given the great dangers inherent in vaporized propane gas, one could not, by relying solely on his contract rights, avoid a duty to inspect where the need for inspection is made readily apparent to the physical senses. In this connection, we note that the written agreement was executed by the parties after Elliott's work and the services required of him had been completed. In fact, in point of time, the agreement postdated any negligent acts or omissions by Elliott.

We are impressed by the reasoning of the court in *Fairfax Gas & Supply Co. v. Hadary*, 151 F. (2d) 939 (CCA 4th 1945). While undoubtedly the facts of the *Fairfax* case are a bit stronger than those of the case at bar, the underlying principles remain the same. There, the court had under consideration a clause somewhat similar to the one involved here. It appeared that the defendant's agent there had knowledge of a leak in a gas system but took no steps to

remedy it. On trial, the defendant relied on the contractual provision which provided specifically that the "Company shall not be liable for property or personal injury resulting from leakage, fire, explosion, or from any other cause whatsoever." (p. 940) In determining the extent to which such a provision should be accorded validity, the court said, at p. 942:

"Even then if it be the rule that a purely private contractor may by contract generally relieve itself of liability for mere negligence, such a rule, we think, should have no application to the facts of the instant case. To us, the conduct of Fairfax may certainly be called gross negligence; perhaps we may go further and state that it closely verges on, if it does not actually attain, the quality of wantonness. Our social conscience is shocked at the idea that Fairfax should be here permitted to hide behind the beneficent shield of contract. Common humanity would seem to require, contract or no contract, that Hadary should be apprised by Fairfax of what it knew was a danger, both real and imminent."

See, also, 175 A. L. R. 8 for an exhaustive annotation on the general problems involved in considering the validity of contracts protecting one from his own negligence.

It is contended that a contractual duty to inspect was assumed by Elliott by virtue of certain alleged prior oral promises to inspect made by him. On cross-examination, Mr. Reeder testified that Elliott said he would inspect, once Reeder had made the installation. It does not appear from the testimony whether the inspection was to be of the entire pipe line. When examined by his own counsel, Mr. Elliott could not remember specifically whether he had made any such agreement. In oral argument on rehearing, much emphasis was placed on the theory of an assumption of a contractual duty to inspect, although we note that little was said of this matter in the original briefs of the parties.

We do not think that any contractual assumption of a duty to inspect can rest on this alleged oral agreement. A merger clause in the contract excludes all prior oral agreements of either party. It is true that no objection was made at the trial concerning the admission of evidence relative to

contractual liability, but this is of no moment. Testimony of this prior oral agreement to inspect, if it were permitted to come in, would directly vary the provisions of the written contract. We have said that the parol evidence rule is a rule of substantive law, and that failure to object to oral testimony inconsistent with the written agreement does not constitute a waiver of the right to have inconsistent parol excluded. *McGregor v. First Farmers'-Merchants' Bank & Trust Co.*, 180 Wash. 440, 40 P. (2d) 144.

For the reasons indicated, it must be held that there was no *contractual* assumption of a duty to inspect here, and that liability must rest on the law of negligence alone.

The judgment of the trial court is affirmed.

GRADY, C. J., MALLERY, SCHWELLENBACH, HILL, and HAMLEY, JJ., concur.

OLSON, J. (dissenting)—I cannot agree that the evidence is sufficient to establish the liability of defendants, either upon the contract theory rejected by the majority or upon the tort theory accepted by the majority.

To establish liability in tort, plaintiffs must show that defendants did not exercise reasonable care commensurate with the dangerous nature of the substance they were installing. In the absence of a contractual duty on defendants to inspect the installation, plaintiffs assume the burden of inspecting and maintaining their equipment in safe condition, and defendants had the right to assume, in the absence of notice, that plaintiffs had performed this duty. These rules are stated in the *Moran* case cited in the opinion.

The majority state that it is conceded that defendants had no actual notice of any defect in plaintiffs' installation. For this reason, the cited *Fairfax* case is not in point.

Constructive notice of the defective installation remains as the only possible basis of defendants' liability. The majority rely upon but two circumstances to support this ground of recovery. The first is that Mrs. Reeder complained of the odor of gas in the kitchen when the burners were being adjusted. The escape of gas was to be expected during this process, and an odor in the room at this time

cannot be said to require a reasonable man to search for a defect in the pipe line. The second is that the metal in the pipe at the tank and at the stove was dissimilar. The evidence is that Elliott did not observe this difference. He had been told by plaintiffs that one piece of pipe would be used. He was not told that a connection had been made in the line, and he had no reason to look for one.

When Elliott finished his work, the stove functioned properly. No cause of the explosion was shown. Any hissing noise caused by the leak was noticed after and not before the explosion. To hold defendants liable upon the facts of this case makes them insurers and also enlarges their duty specified by their contract with plaintiffs and by the rules expressed in the *Moran* case.

The question of the contributory negligence of plaintiffs has not been discussed. Their recovery is also barred on this ground because of the defective nature of the connection they installed in the gas line, and possibly other facts in the case.

The judgment should be reversed.

DONWORTH and WEAVER, JJ., concur with OLSON, J.

---

June 16, 1953. Petition for rehearing denied.