[No. 62553-1.    En Banc.    March 28, 1996.]

PATRICIA VODOPEST, *Petitioner*, v. ROSEMARY MACGREGOR, *Respondent*.

842

*Schroeter, Goldmark & Bender, P.S.*, by *William J. Rutzick*, for petitioner.

*Kraft, Kimbrough & Ganz*, by *Joseph J. Ganz*, for respondent.

*Bryan P. Harnetiaux, Gary N. Bloom*, and *Debra L. Stephens* on behalf of Washington State Trial Lawyers Association, amicus curiae.

Guy, J. — This case involves a summary judgment which dismissed a negligence action based on an exculpatory clause in a preinjury release. We are faced with the question whether preinjury releases which bar a cause of action for negligence in the context of a medical research project violate public policy.

## FACTS

Both the Plaintiff and the Defendant are nurses and mountain trekkers. In the fall of 1989, Patricia Vodopest (Plaintiff) read an article in *The Mountaineer* magazine entitled "Breathe Like a Sherpa at High Altitudes" written by Rosemary MacGregor (Defendant). The article described a 1989 "preliminary study" involving a trek to Everest base camp in the Himalayas to test a theory on a breathing technique to be used at high altitudes to alleviate "high altitude sickness." The article explained that a group of trekkers had been trained to use a breathing

technique using a biofeedback breathing tracer and that some of the trekkers had been put through a respiratory challenge test by Dr. Robert Shoene at the Harborview pulmonary lab. The article explained that while on the trek, the group used an oximeter to measure oxygen saturation while trekking and concluded that the technique had proved successful in alleviation of high altitude sickness. Defendant MacGregor's article explained that her special technique of "altitude breathing" required weeks to months of training while climbing or hiking. The article concluded with the statement that MacGregor intended to "take a second research group" to the Himalayas in the spring of 1990 and asked for interested parties to contact her.

Plaintiff Vodopest later read a second article in the *Boeing Alpine Club* newsletter entitled "Nepal, Himalayan Breathing Research Trek—WOULD YOU LIKE TO GO?" That article stated that in March 1990, a party of 15 trekkers would be going to the Solo Khumbu area of Nepal to "continue research on a 'Sherpa Breathing' technique for high altitude survival." It stated that "[w]e are repeating a successful research trip conducted in April of 1989" in which "seven trained breathers performed well at high altitude and were able to consistently eliminate all symptoms of altitude sickness." The trip leader was Rosemary MacGregor, a nurse and stress-management/biofeedback therapist. The article concluded with, "If you are interested in being a research subject on this trek, please call Rosemary . . ." and stated that "breathing training needs to take place as soon as possible."

Plaintiff Vodopest agreed to join the trek partly because MacGregor was a nurse and because MacGregor would be doing research on breathing techniques to eliminate high altitude sickness. MacGregor trained Vodopest on the breathing techniques.

One of the members of the trek group was Dr. Merrill Hille who was an associate professor at the University of

Washington. MacGregor asked Professor Hille to collaborate on MacGregor's breathing research for the 1990 trek. Professor Hille and MacGregor submitted a "Research Proposal" on the "Effect of Biofeedback on Control of Ventilation and Performance at High Altitude" to the University of Washington Human Subjects Review Committee. The initial application which was submitted included biofeedback training involving the breathing technique; but since the training had already begun for the trekkers prior to the application of the research proposal, the University Committee declined to review that research proposal because the University does not review research which is already in progress. The application was reformulated and resubmitted to the University. Approval from the University, therefore, was limited to the part of the research involving the collection of the data (from the oximeter readings and questionnaires) from the trekkers and the control groups and did not include the training in the breathing. The research included two control groups comprised of Nepalese sherpas and porters, and random hikers. One of the documents in the proposal to the University indicated that the purpose of the study was to "evaluate the effects of breathing training using biofeedback (oximetry) at high altitudes" and stated that "[t]he results of this study may provide information on potentially life-saving breathing practices at high altitude."

At Defendant MacGregor's request, Vodopest signed a form entitled "Release from Liability and Indemnity Agreement" which stated that she had been informed of all dangers of the trek including "illness" and that she released MacGregor "from all liability, claims and causes of action arising out of or in any way connected with my participation in this trek." The release also stated, "I personally assume all risks in connection with all activities, and further agree to indemnify and release Rosemary MacGregor, other group leaders, and all other participants from all liability, claims and causes of action or harm which may befall me arising from my participation in this trek."

A copy of this release agreement, different only in that it included Professor Hille and the University in addition to MacGregor as the released parties, was submitted to the University but was returned to MacGregor and Professor Hille stamped "INVALID FORM." The manager of the Human Subjects Division at the University explained that releases from liability for negligence are not allowed as a part of any approved study, as the federal government does not allow exculpatory language in human subject experimentation. Defendant MacGregor did not tell the trekkers that the release form had been rejected by the University's Human Subjects Division.

The trekkers left Seattle for Phakding, Nepal, on March 5, 1990. During the trek, Vodopest and the other trekkers recorded their oximetry readings and completed the environmental symptoms questionnaires. Vodopest began to exhibit symptoms of altitude sickness at 8,700 feet. MacGregor was her roommate and was aware of her symptoms. MacGregor said it might be a food problem and Vodopest continued to climb the next day. As she continued to ascend, her symptoms increased. She was nauseated, had a headache, was dizzy, could not eat or drink, was not urinating, and was exhausted and dazed. Defendant MacGregor gave her rehydration salts and Vodopest continued to ascend with MacGregor's physical support. Vodopest states that as a research subject, it was her responsibility to chart her symptoms twice a day and that since this was done on the form that MacGregor had her fill out for the research on altitude sickness, she expected MacGregor was reviewing them.

The day Vodopest reached 11,300 feet, she alleges she again reported being very ill but the group went on because MacGregor told Vodopest to continue to breathe correctly and she would be fine. Defendant MacGregor told Vodopest that she probably had the Khumbu flu and told her to "breathe away" the symptoms. On the trek from Phortse Tenge to Dole, Vodopest's symptoms became life-threatening. She allegedly developed cerebral edema demonstrated by symptoms of shortness of breath, racing

heart beat, terrible head pain, nausea, vomiting, loss of balance, and a swollen face. Another nurse/trekker administered simple neurological tests which Vodopest failed. Defendant MacGregor allegedly suggested that Vodopest had an ear infection. The next morning Vodopest was sent down and was ultimately diagnosed with cerebral edema from altitude sickness. As a consequence, she states she suffered permanent brain damage.

Vodopest sued MacGregor, asserting claims for negligence and gross negligence.[1] Vodopest claimed that she suffered neurological damage because of MacGregor's negligence in promoting the use of her breathing technique, rather than advising Vodopest to descend to a lower altitude, as a remedy for her symptoms of high altitude sickness. Defendant MacGregor moved for summary judgment based on the exculpatory agreement contained in the preinjury release. Plaintiff Vodopest argued that the preinjury release of liability for negligence in the setting of a medical research project violated public policy. The trial court granted summary judgment on the action for negligence but refused to dismiss the cause of action for gross negligence, holding that a preinjury release is not valid with regard to gross negligence. The gross negligence claim was tried to a jury. The jury found in favor of the Defendant.

Vodopest appealed the dismissal of the negligence claim. The Court of Appeals, in a divided, unpublished opinion, upheld the summary judgment. The majority of the Court of Appeals concluded that the Nepal trip was primarily a trek and the release was therefore valid. The dissent found the facts sufficient to characterize the trek as a research project involving human subjects and concluded that experimenters owe research subjects a duty of reasonable care from which they should not be permitted to obtain relief even when the research activity overlaps with a

[1]Vodopest also brought causes of action for lack of informed consent and violation of the Consumer Protection Act, but those actions were dismissed on summary judgment with the Plaintiff's agreement.

high-risk, adult recreational activity. Both the majority and the dissent rely on, but reach different conclusions in applying the factors enunciated in, this Court's opinion in *Wagenblast v. Odessa Sch. Dist. 105-157-166J*, 110 Wn.2d 845, 758 P.2d 968, 85 A.L.R.4th 331 (1988).

ISSUE

The only issue before us is whether the preinjury release signed by the Plaintiff is effective to totally bar her cause of action for negligence. As discussed below, we determine it is not.

DISCUSSION

▮▮ Exculpatory clauses in preinjury releases are strictly construed and must be clear if the exemption from liability is to be enforced. *Scott v. Pacific W. Mountain Resort*, 119 Wn.2d 484, 490, 834 P.2d 6 (1992). If a release is clear, the general rule in Washington is that exculpatory clauses are enforceable unless (1) they violate public policy, or (2) the negligent act falls greatly below the standard established by law for protection of others, or (3) they are inconspicuous. *Scott*, 119 Wn.2d at 492; *Wagenblast*, 110 Wn.2d at 856.

In this case, the parties do not argue the release was unclear. The jury determined that the Defendant's conduct did not fall greatly below the standard of care. There is no allegation that the language was inconspicuous. Therefore, the issue here is whether this release violates public policy.

The Defendant argues that this case involves only a high-risk sport, while the Plaintiff argues the case involves medical research using human subjects. If the case involves only a high-risk sport, then prior Washington law determines the issue.

Appellate decisions in Washington have consistently upheld exculpatory agreements in the setting of adults engaging in high-risk sporting activities. *Blide v. Rainier*

*Mountaineering, Inc.*, 30 Wn. App. 571, 636 P.2d 492 (1981) (mountain climbing); *Boyce v. West*, 71 Wn. App. 657, 862 P.2d 592 (1993) (scuba diving); *Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 728 P.2d 617 (1986) (automobile demolition derby); *Hewitt v. Miller*, 11 Wn. App. 72, 521 P.2d 244 (scuba diving), *review denied*, 84 Wn.2d 1007 (1974); *Garretson v. United States*, 456 F.2d 1017 (9th Cir. 1972) (ski jumping applying Washington law); *Scott*, 119 Wn.2d at 493 (adhering to prior law that an adult sports participant can waive liability for another's negligence; *see also* Thomas H. Winslow & Ernest J. Asprelli, Jr., *Negligence Disclaimers in Hazardous Recreational Activities*, 68 Conn. B.J. 356 (1994). Consistent with prior Washington law, we reiterate that releases are enforceable in the setting of adult high-risk sports activities.

Outside of these voluntary high-risk sports situations, our courts have often found preinjury releases for negligence to violate public policy. *McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 486 P.2d 1093 (1971) (striking down a landlord's exculpatory clause relating to common areas in a multifamily dwelling complex); *Thomas v. Housing Auth.*, 71 Wn.2d 69, 426 P.2d 836 (1967) (voiding a lease provision exculpating a public housing authority from liability for negligence); *Reeder v. Western Gas & Power Co.*, 42 Wn.2d 542, 256 P.2d 825 (1953) (finding a contractual limitation on the duty of a gas company against public policy); *Sporsem v. First Nat'l Bank*, 133 Wash. 199, 233 P. 641 (1925) (holding a bank which rents safety deposit boxes cannot, by contract, exempt itself for liability for negligence). Additionally, courts have not allowed those charged with a public duty, which includes the obligation to use reasonable care, to insulate themselves from that obligation by contract. *Wagenblast*, 110 Wn.2d at 849-50 n.8 (where a defendant is a common carrier, an innkeeper, or a public utility, an agreement discharging the defendant's performance will usually not be given effect); *see also American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 230, 232, 797 P.2d 477 (1990) (professional bailees may not limit their li-

ability for negligence, but nonprofessional bailees may contract to limit their liability for negligence); *Scott*, 119 Wn.2d at 494-95 (preinjury release of a party's liability for negligence which releases a child's cause of action for personal injuries, even in the context of high-risk sports, violates public policy and is unenforceable).

Prior to 1988, our courts decided the question whether one may be contractually insulated from liability for negligence on a case-by-case basis. In *Wagenblast*, we set forth a number of factors that have historically been relevant to courts in making that determination. In *Wagenblast*, we considered whether exculpatory clauses should be allowed as a condition of participation in interscholastic athletics and we held that the exculpatory clauses used by the school districts to release themselves from future negligence claims violated public policy and were therefore invalid. We explained that while parties may in some settings contract that one will not be liable for his or her own negligence to another, there are instances where public policy reasons for preserving an obligation of care owed by one person to another outweigh our traditional regard for the freedom of contract. *Wagenblast*, 110 Wn.2d at 849; *Scott*, 119 Wn.2d at 493.

The majority of the Court of Appeals in the present case concluded that the trip was "primarily a trek" and that the breathing study was an incidental, informal experiment subsumed in what was otherwise a typical high-risk recreational trek. *Vodopest v. MacGregor*, No. 33123-0-I, slip op. at 10 (Wash. Ct. App. Dec. 27, 1994). The record, however, does not support this factual conclusion. In a motion for summary judgment, facts and all reasonable inferences therefrom must be construed in the light most favorable to the nonmoving party. *Scott*, 119 Wn.2d at 502. Many documents and statements in the record support the conclusion that the medical research was a significant component of the trip. The article in *The Mountaineer* magazine authored by the Defendant solicited participation in a "research group" to go to the Himala-

yas. The Boeing newsletter article was entitled "Nepal Himalayan Breathing Research Trek" and stated the group would "continue research on a 'Sherpa Breathing' technique for high altitude survival" and concluded, "If you are interested in being a research subject . . . call . . . ." A letter from the Defendant and Professor Hille to the trekkers began, "Dear Nepal High Altitude Experiment Participants" and stated that they were still in the process of having "our research project approved by the University of Washington's Human Subjects Review Board." The fact that the University only approved a portion of the research project does not affect whether the project was, in fact, a research project. The University declined approval of a part of the project because it had commenced prior to the application to the University. The Sherpa, Porter, Highlander Consent Form stated, "I, _____ have agreed to be a control subject for this research." The "Sagarmatha Park Questionnaire" requesting data on high altitude sickness symptoms from randomly selected hikers stated, "We are a group from Seattle Washington and the University of Washington doing a study on high altitude sickness." A report by one of the trekkers to the Washington State Department of Health stated, "I was recently a member subject of a high altitude breathing research project/trek to Nepal lead by Rosemary MacGregor . . . for the purpose of studying abdominal pursed-lip breathing, oxygen levels in the blood, and their relationship to high altitude symptoms." The document entitled "Research Proposal" submitted to the University by the Defendant and Professor Hille was subtitled "Effect of Biofeedback on Control of Ventilation and Performance at High Altitudes." The declaration of Dr. Schoene, the physician at the Harborview pulmonary research laboratory who conducted testing on the 1989 trekkers, stated that "[a] primary purpose of this 1990 trek to Nepal was an experiment on human beings, including Ms. Vodopest, to gather data on the trekkers' oxygen saturation at various altitudes during rest and exercise, utilization of a certain breathing technique at high altitudes, and com-

parison of data with the trekkers' symptoms and with data of a control group." The Defendant in her deposition stated, "I was the organizer and the leader of the research, and the people in Nepal were the leaders and the organizers of the trek in Nepal." We conclude from a review of the record that the Defendant represented the trip as a research project which utilized human subjects and that other participants and involved parties believed the trek involved a medical research experiment.

■ Medical research includes a class of activities designed to develop or contribute to generalizable knowledge and generalizable knowledge consists of theories, principles, or relationships (or the accumulation of data on which they may be based) that can be corroborated by accepted scientific observation and inference. Robert J. Levine, *Ethics and Regulation of Clinical Research* 3 (2d ed. 1988); *see* Department of Health and Human Services Rules and Regulations, 45 C.F.R. § 46.102(d) (1994) (research means a systematic investigation designed to develop or contribute to generalizable knowledge). Ordinarily, whether a given endeavor constitutes medical research will be a question of fact. However, when the researcher represents to the potential subjects that the project involves medical research using human subjects, then we can find as a matter of law that the endeavor is a medical research project for the purpose of deciding the validity of a preinjury exculpatory clause. Not every set of facts will lead to a conclusion that an informal investigation is medical research. However, in this case, the experimentation was represented by the investigator to be research; sponsorship from the Human Subjects Division of the University of Washington was sought, and the participants considered themselves to be subjects in a medical research project to avoid the onset of a life-threatening illness.

■ The critical question here is not whether the trip was primarily a recreational trek or primarily a research project; the record is clear that it was both. Rather, the

question is whether the alleged conduct giving rise to the cause of action for negligence occurred in the context of the mountain trekking or within the scope of the research project. The focus is whether the conduct that caused the injury was within the risks *legally* assumed in the exculpatory agreement. As discussed below, insofar as the Defendant attempts to use the agreement to release herself as a researcher from negligent acts performed in the furtherance of medical research, it is unenforceable. This does not necessarily mean the release is void for all purposes. A release may be effective for some, but not all, purposes. For example, a release may be effective for negligent conduct but would be unenforceable as it relates to gross negligence or willful conduct. *Boyce*, 71 Wn. App. at 663 n.6; *Blide*, 30 Wn. App. at 573-74. In the present case, if the plaintiff had fallen on a steep trail as the result of the Defendant's negligence, the release may have been effective to bar a cause of action for negligence (because the context would be only a high-risk sport). However, if the Defendant had misused a piece of medical equipment in the course of a medical experiment, the release would not be effective to bar the action if contracts which release a medical researcher for negligence are void as violative of public policy.

The question, whether the Defendant's conduct which allegedly caused the injuries occurred in furtherance of the medical research project, is a question of fact which must be decided by the finder of fact. Because there is some evidence in the record which could support a conclusion that the conduct which caused the injuries occurred within the scope of the medical research project, summary judgment is not appropriate on this question. The Plaintiff's affidavit repeatedly alleges that in spite of serious symptoms of high altitude sickness, Defendant MacGregor, who was conducting research on that condition, encouraged the Plaintiff to continue to use the breathing techniques to alleviate the symptoms and to continue to ascend. The Plaintiff states that "[a]s a consequence of Rosemary's [MacGregor's] failure to recognize signs and

symptoms of severe altitude sickness, the very thing that she was doing research on, I was encouraged to breathe and to go even higher and finally developed a life-threatening cerebral edema." Dr. Schoene's declaration states that "the breathing technique that Rosemary MacGregor promoted and trained the participants in was experimental in nature and, therefore, had not been found to be reliable in its alleviation of symptoms of altitude sickness. In fact, all the literature and discussions by experts on altitude sickness have always indicated that descent is the rule. The overzealous use by Ms. MacGregor of her breathing techniques to cure altitude symptoms, rather than evacuation of Ms. Vodopest to a lower altitude, when Ms. Vodopest started showing symptoms of moderate to severe altitude sickness, was a major cause of Ms. Vodopest's developing cerebral edema."

We conclude there was evidence (which creates an issue of fact) which could support a finding that the alleged negligence occurred during the course of the medical research. The question then becomes whether preinjury agreements, which release a researcher for liability for negligent conduct which occurs in the course of the medical research, are void as against public policy.

■ In *Wagenblast*, we set forth six characteristics, taken from *Tunkl v. Regents of Univ. of Cal.*, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963), which may be considered in determining whether an exculpatory agreement violates public policy. Those six characteristics are whether: (1) the transaction concerns a business of a type generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public;[2] (3) the party holds himself out as willing to perform this service for any member of the public who

---

[2]The "practical necessity" language is not construed strictly, and courts have rejected the contention that the service involved must be a "necessity of life" such as food, housing, or medical care. *McCarn v. Pacific Bell Directory*, 3 Cal. App. 4th 173, 180, 4 Cal. Rptr. 2d 109 (1992).

seeks it, or at least for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services; (5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; (6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents. *Wagenblast*, 110 Wn.2d at 851-52 (citing *Tunkl*, 60 Cal.2d at 98-101; 383 P.2d at 444-46).

In a setting which involves one or more of these characteristics, a preinjury release from liability for negligence may violate public policy. *Wagenblast*, 110 Wn.2d at 851; *Tunkl*, 60 Cal.2d at 98, 101; 383 P.2d at 444, 446-47. These factors are not the exclusive considerations to which a court may look in the determination of public policy. These general characteristics are taken from prior court cases and only give a "rough outline" of the type of settings in which exculpatory agreements have not been allowed. *Tunkl* warns that no definition of the concept of public interest can be contained within the four corners of any formula, 60 Cal.2d at 98; 383 P.2d at 444, but the *Wagenblast* factors are helpful in many cases. As discussed more fully below, medical research is the kind of endeavor which is generally thought suitable for public regulation and is, in fact, highly regulated. It is also of great importance to society. In this case, Defendant's invitation to participate as a research subject was open to the public and the allegation here is that the influence and control the Defendant had over the Plaintiff was the cause of Plaintiff's injuries. Generally, medical researchers have significant control over the safety of their human research subjects. In spite of the fact that this was not an adhesion

contract, in that there was no particular unequal bargaining strength, we conclude there are critical public policy reasons to maintain the usual standard of care in settings where one person is using another as a medical research subject. Medical research using human subjects is one of those settings where public policy reasons for preserving an obligation of care owed by the researcher to the subject outweighs our traditional regard for freedom of contract.

An important inquiry in deciding if a release for negligence should be upheld is whether the agreement concerns an endeavor of a type which is generally thought suitable for public regulation. *Wagenblast*, 110 Wn.2d at 852. The University was affiliated to some extent with this project and the manager of the Human Subjects Division at the University testified in her deposition that the research project of MacGregor and Professor Hille was considered to be conducted by a faculty member of the University, and that the Human Subjects Review Committee was "responsible to assure the safety, welfare and privacy of human subjects." That fact alone does not resolve the question, for the issue is not whether the particular endeavor is regulated but rather whether it is of a *type* generally thought suitable for public regulation. The Court of Appeals dissent points out that "[t]he operator of an activity in a highly-regulated field who has managed to evade regulation should be scrutinized *more* carefully, if anything; certainly not less so." *Vodopest*, slip op. at 3 (Becker, J., dissenting). We agree. Whether releases for negligence in this setting violate public policy is for this court to decide. *See, e.g., Wagenblast v. Odessa Sch. Dist. 105-157-166J, supra; McCutheon v. United Homes Corp., supra.* It is not necessary that a particular activity be directly regulated by statute or regulation for this court to find that exculpatory agreements violate public policy. Whether the activity is of a type suitable for public regulation is a factor that we consider when deciding if preinjury agreements which bar causes of action for negligence should be allowed in a given setting.

Medical research is highly regulated. *See* William J. Curran, *Medical Research on Human Subjects*, 92 Yale L.J. 577 (1983) (book review) (alluding to the vast amount of federal statutes and regulations controlling clinical investigations). There are extensive federal regulations for the protection of human research subjects. Department of Health and Human Services Rules and Regulations, 45 C.F.R. pt. 46 (1994) (protection of human research subjects). The federal regulations explicitly prohibit the use of exculpatory agreements in any human subjects research. The federal regulation's general requirements for informed consent states:

> No informed consent, whether oral or written, may include any exculpatory language through which the subject or the representative is made to waive or appear to waive any of the subject's legal rights, or releases or appears to release the investigator, the sponsor, the institution or its agents from liability for negligence.

45 C.F.R. § 46.116 (1994).[3] In accord with this federal regulation, the University of Washington's Human Subjects Manual forbids the use of waivers that would bar an action for negligence. Clerk's Papers at 177.

Research indicates that the federal regulations prohibiting preinjury releases for negligence are generally adhered to in the context of human subjects research. Levine, *supra*, at 37-38; W.F. Bowker, *Exculpatory Language in Consent Forms*, 4 IRB: A Review of Human Subjects Research 1, 9 (Mar. 1982) (letter to editor); Nathan Hershey & Robert D. Miller, *Human Experimentation and the Law* 95 (1976) (citing federal regulation which bars exculpatory language from informed consent in research and noting that even apart from such regulation, any exculpatory clause waiving legal rights to recover for harm suffered as a result of negligence prior to participation in a study would be of doubtful enforceability in a

---

[3]*See also* 21 C.F.R. § 50.20 (1995) (prohibiting exculpatory agreements concerning negligence in clinical investigations regulated by the FDA).

court of law in practically all, if not all, states); George J. Annas et al., *Informed Consent to Human Experimentation: The Subject's Dilemma* 43, 52 (1977) (citing to regulations which prohibit exculpatory clauses and noting that any state or the federal government could regulate dangerous human experimentation to prevent reckless experiments and to promote and protect experimentation done according to specified rules); Paul S. Appelbaum et al., *Informed Consent, Legal Theory and Clinical Practice* 220-21 (1987) (the prospective oversight of all research which has evolved primarily to prevent exploitation of research subjects in the United States has been created primarily by federal regulation, although some states have supplemented it with statutes); Dennis M. Maloney, *Protection of Human Research Subjects* (1984) (discussing the huge body of law concerning human subjects research). No case or scholarly authority has been located that recommends that exculpatory clauses for negligent conduct should be allowed in the setting of human subjects research.

We conclude that human subjects research is a type of endeavor which is suitable for public regulation.

One of the important characteristics that Washington cases have identified when deciding if exculpatory clauses violate public policy is the practical importance of the activity in question. *Wagenblast*, 110 Wn.2d at 849-51 (discussing cases), 853; *see, e.g., Scott*, 119 Wn.2d at 493; *McCutcheon v. United Homes Corp., supra.* One author suggests that a survey of cases assessing exculpatory clauses reveals that the common determinative factor for Washington courts has been the services' or activities' importance to the public. Recent Case, *Negligence—Exculpatory Clauses—School Districts Cannot Contract Out of Negligence Liability in Interscholastic Athletics—Wagenblast v. Odessa School District, 110 Wash. 2d 845, 758 P.2d 968 (1988)*, 102 Harv. L. Rev. 729 (1989).

The fact that a given disease is not commonly encountered by members of the public does not make medical

research into its cure of little public importance. Dr. Schoene's declaration emphasizes the seriousness of high altitude sickness and that it progresses from cerebral edema to coma and death. One of the documents used in this research project by the University stated that the results of MacGregor's and Professor Hille's "study may provide information on potentially life-saving breathing practices at high altitude."

In *Tunkl v. Regents of Univ. of Cal., supra,* the California Supreme Court invalidated, as adversely affecting the public interest, a research hospital's requirement that a patient release the hospital from liability for future negligence as a condition of admission for treatment. Medical research, like the provision of medical care, is of great importance to the public. The California statute dealing with human experimentation explains that medical experimentation on human subjects is vital for the benefit of mankind, but such experimentation shall be undertaken with due respect to the preciousness of human life. The legislative findings and declarations of that statute explain that it is necessary that medical experimentation be done in such a way as to protect the rights of the human subjects involved; and that there is, and will continue to be, a growing need for protection for citizens from unauthorized, needless, hazardous, or negligently performed medical experiments on human beings. Cal. Health & Safety Code § 24171 (West 1992).

We conclude that medical research, including research involved with attempts to find a way to avoid the onset of high altitude sickness, is a matter of public importance.

Another important consideration in deciding if an exculpatory clause violates public policy is whether the person who signs the release will be under the control of the person seeking exculpation for negligence and subject to the risk of that person's carelessness. The element of a researcher's control over a subject is common to most medical research projects and is one of the reasons why such strict regulations are imposed. *See* Curran, *supra,* at

579-81. Scholars on the subject of the ethics of medical research describe the relationship between investigator and subject as a fiduciary relationship. Levine, *supra*, at 98.

In this case, the Defendant designed the research protocol, had the Plaintiff chart her symptoms twice daily, and had her test her oxygen saturation levels using an oximeter. Furthermore, the Defendant allegedly instructed the Plaintiff to use the breathing techniques the Defendant had taught her and to continue to ascend after the Plaintiff began exhibiting symptoms of high altitude sickness. Dr. Schoene's declaration explains that one of the known symptoms of altitude sickness is mental confusion and lack of judgment and that this made the Plaintiff particularly dependent on the leader of the research to inform her of the need to descend. Defendant MacGregor admitted she was the leader of the research, and it is reasonable to assume that one doing research on this illness would know of these symptoms.

We explained in *Wagenblast*, 110 Wn.2d at 851, that an exculpatory clause can contravene public policy when it meets "some or all" of the six enumerated characteristics. In this case, a number of the *Wagenblast* factors militate against validating preinjury release forms which insulate a researcher for negligent conduct in the context of medical research on human subjects. Prior Washington cases which have disallowed exculpatory agreements in the landlord-tenant setting, for professional bailments, for common carriers, for negligent conduct toward school children, or for utility companies, provide support for our conclusion that medical research is not a setting where exculpatory agreements should be allowed. Cases in other jurisdictions which forbid preinjury releases for negligence between a health care provider and a patient also support this conclusion. *See generally* A.M. Swarthout, Annotation, *Validity and Construction of Contract Exempting Hospital or Doctor from Liability for Negligence to Patient*, 6 A.L.R.3d 704 (1966 & Supp. 1995). The federal regula-

tions involving human subjects research, adhered to by the University of Washington and other responsible research institutions, are strong evidence that a medical researcher should not be allowed to conduct research on human beings without being held to the normal duty of care. The public's interest in the safety of human subjects and the public's interest in the integrity of legitimate and necessary research militate against allowing researchers to negligently conduct research with impunity. One of the foremost scholars on the subject of ethics in medical research[4] writes that medical research is a situation in which society encourages its members to take risks to serve society's interests. He points out that one reason to allow legal redress for injuries occurring during research is to encourage individuals to voluntarily take certain kinds of risks of injury to serve the interests of society. Levine, *supra*, at 156-57. The public policy in favor of protecting a subject's safety counsels against allowing amateur medical research which is not held to the normal standard of reasonable care.

We wish to be very clear that it is only *negligent* conduct which cannot be the subject of a preinjury release. With proper informed consent, an ill patient may wish to consent to a highly experimental treatment which might otherwise not be generally accepted. *See Colton v. New York Hosp.*, 98 Misc. 2d 957, 969-70, 414 N.Y.S.2d 866 (1979) (where a patient voluntarily agrees to undergo an experimental and inherently dangerous procedure, the parties may covenant to exempt the physician from liability for those injuries which are found to be the consequences of the nonnegligent, proper performance of the procedure). *See also Shorter v. Drury*, 103 Wn.2d 645, 695 P.2d 116 (1985) (involving the effect of a patient's release for ill effects due to her refusal to permit blood transfusions).

---

[4]*See* Curran, *supra*.

## CONCLUSION

■ We conclude that a preinjury agreement, which releases a medical researcher for liability for negligent conduct which occurs in the course of medical research, violates public policy. To the extent the preinjury release involved here attempts to release the Defendant for negligent conduct during the research on high altitude sickness, it is unenforceable. A material question of fact exists on whether the alleged conduct giving rise to the cause of action for negligence occurred within the scope of the medical research project. We reverse the order granting summary judgment on the negligence cause of action and remand to the trial court.

DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, and ALEXANDER, JJ., and PEKELIS, J. Pro Tem., concur.

TALMADGE, J. (concurring) — I concur that a trial on the merits of Patricia Vodopest's claim of negligence against Rosemary MacGregor is required. However, I write separately because we should take this opportunity to clarify our analysis of pre-injury release agreements.

## ANALYSIS

### A. The Trial Court Erred in Granting Summary Judgment

Patricia Vodopest agreed to release Rosemary MacGregor from any liability arising out of hazards connected with Vodopest's participation in a trek to the Himalayas. She did not agree to release Rosemary MacGregor from negligence in diagnosing and treating Vodopest's medical condition.

The release agreement Vodopest signed states:

RELEASE FROM LIABILITY AND INDEMNITY AGREE-MENT

I, PATRICIA VODOPEST, hereby state that I wish to participate in this Everest/Gokyo trek and that I have been informed of all possible hazards that might be encountered. I recognize that all outdoor activity and especially altitude trekking may involve certain dangers, including but not limited to: illness, injuries, accidents, and [sic] but also the hazards of travel, not being in good health or condition, forces of nature and the actions of the participants and other persons. I also understand that the nature of this trek is partially Nepalese in its arrangements and although all precautions are being taken, one can not [sic] guarantee human behavior.

I understand that it is not the function of the leaders of this trek to serve as the guardians of my safety. I also understand that I am to furnish my own personal equipment and I am responsible for its safety and good operating condition regardless of where I obtain it.

In consideration of and as part of this group and my willingness to participate, I hearby [sic] release Rosemary MacGregor from all liability, claims and causes of action arising out of or in any way connected with my participation in this trek (March 5, 1990 - April 10, 1990). I personally assume all risks in connection with all activities, and further agree to indemnify and release Rosemary MacGregor, other group leaders, and all other participants from all liability, claims and causes of action or harm which may befall me arising from my participation in this trek. The terms of this agreement shall serve as a release and indemnity agreement for my heirs, personal representatives, and for all members of my family, including minors.

I further state that I am 18 years of age or older and legally competent to sign this release, that I understand these terms are contractual and not a mere recital, and that I have signed this document as my own free act.

I HAVE FULLY INFORMED MYSELF OF THE COVENANTS OF THE CONTENTS OF THIS RELEASE AND INDEMNITY BY READING IT BEFORE I HAVE SIGNED IT.

NAME    /s/ Patricia Vodopest    DATE 1/14/90

Clerk's Papers at 39. There is no evidence in the record the release was negotiated between Vodopest and MacGregor.

There are two competing characterizations of the cause of Vodopest's injuries. Vodopest argues the purpose of the trek to the Himalayas was for "medical research" and her injuries arose out of MacGregor's negligent insistence that Vodopest use her experimental breathing techniques to combat high altitude sickness. Clerk's Papers at 45-46. MacGregor argues the purpose of the trip was recreational and Vodopest's injuries arose out of a high-risk mountaineering expedition. Clerk's Papers at 4.

If Vodopest's injuries were caused only by mountaineering, summary judgment would be appropriate. Washington case law has frequently upheld pre-injury release agreements for potentially hazardous recreational activities like scuba diving (*Hewitt v. Miller*, 11 Wn. App. 72, 521 P.2d 244, *review denied*, 84 Wn.2d 1007 (1974); *Boyce v. West*, 71 Wn. App. 657, 862 P.2d 592 (1993)); mountain climbing (*Blide v. Rainier Mountaineering, Inc.*, 30 Wn. App. 571, 636 P.2d 492 (1981), *review denied*, 96 Wn.2d 1027 (1982)); automobile demolition derby driving (*Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 728 P.2d 617 (1986)); and skiing (*Scott v. Pacific W. Mountain Resort*, 119 Wn.2d 484, 834 P.2d 6 (1992)).

If, however, Vodopest's injuries resulted from medical research or treatment, the pre-injury release agreement cannot be enforced. By its terms, the release agreement did not release MacGregor from liability arising out of her negligent diagnosis and treatment of Vodopest's high altitude sickness on this particular adventure. The record here indicates the trek may have been the locale for MacGregor's research and treatment of Vodopest, whose injuries resulted from that research and treatment, rather than mountaineering. MacGregor allegedly insisted upon her experimental treatment of high altitude sickness instead of evacuating Vodopest to a lower altitude when Vodopest started to show symptoms of altitude sickness.

Summary judgment based on the release agreement was inappropriate.

### B. Pre-Injury Release Agreements in Washington

Our prior decisions in *Scott*, 119 Wn.2d 484, and *Wagenblast v. Odessa School Dist. 105-157-166J*, 110 Wn.2d 845, 758 P.2d 968, 85 A.L.R.4th 311 (1988), give practitioners insufficient guidance for drafting pre-injury release agreements. Trial courts likewise have little guidance for interpreting and enforcing them.

We have ruled on the validity of such agreements in various contexts, identifying general considerations in determining the enforceability of those agreements. In reaching these decisions, we have focused, at times, on the disparity in bargaining power and, at other times, on the importance of the defendant's activity or service to the public. The rationale for our decisions in which public policy defeats a pre-injury release agreement has not always been particularly clear.

Our cases express an antagonism toward pre-injury release agreements I do not share: if a pre-injury release agreement meets the standard set by this Court, it should be enforced as any other contract is enforced. Washington law should recognize the freedom of parties, under appropriate circumstances, to contract with respect to liability. Parties of equal bargaining power may negotiate and agree to allocate risk between themselves, absent a clear public policy reason to the contrary.[5]

The confusion in our law originates in the failure to differentiate between the bargaining process for the pre-injury release agreement and the substance of the agreement. In *Scott*, we held release agreements are enforceable

---

[5]The Restatement (Second) of Torts § 496B (1965) states:

A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

unless (1) they violate public policy, or (2) the negligent act falls greatly below the standard established by law for protection of others, or (3) they are inconspicuous. *Scott*, 119 Wn.2d at 492. Plainly, these concepts involve both the process by which the agreement was negotiated and the substance of the agreement. In *Wagenblast*, we adopted a six-part test for determining whether release agreements violated public policy, one part of the test in *Scott*. Of the six parts, at least two pertain to the bargaining process for the release agreement, discussing the bargaining strength of the parties in the economic setting of the negotiations, and the presence of a standardized adhesion contract of exculpation that makes no provision for a party to decline the release for consideration. The other four *Wagenblast* factors address the substance of the release agreement. *Wagenblast*, 110 Wn.2d at 851-56 (citing *Tunkl v. Regents of the Univ. of Cal.*, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963)).

Separating the substantive aspects of a pre-injury release agreement from the defects in the bargaining process will help clarify the analysis. The Uniform Commercial Code employs this approach with respect to unconscionability. *Nelson v. McGoldrick*, 127 Wn.2d 124, 896 P.2d 1258 (1995); *Yakima County (W. Valley) Fire Protection Dist. 12 v. City of Yakima*, 122 Wn.2d 371, 391, 858 P.2d 245 (1993); *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 259-60, 544 P.2d 20 (1975); Arthur A. Leff, *Unconscionability and the Code — The Emperor's New Clause*, 115 U. PA. L. REV. 485, 487 (1967); John A. Spanogle, Jr., *Analyzing Unconscionability Problems*, 117 U. PA. L. REV. 931, 932 (1969). This approach applies in other settings. *See, e.g.,* RCW 4.24.115 (indemnification agreements in the construction industry).

1. Procedural Fairness

Pre-injury release agreements should be enforced only if the bargaining process was fair. In considering procedural unconscionability, the *Nelson* court looked to the manner in which the agreement was entered, whether the

parties had a reasonable opportunity to understand the contract terms, and whether the terms were hidden in a maze of fine print. Procedural defects during the bargaining process may lead to "the lack of a meaningful choice." *Nelson*, 127 Wn.2d at 131.

In assessing whether the bargaining process for a pre-injury release agreement is fair, several similar criteria may be employed. First, the release agreement must be conspicuous in the overall contractual arrangement between the parties. *Scott*, 119 Wn.2d at 492. Second, the rights of children may not be negotiated away in a pre-injury release agreement. *Scott*, 119 Wn.2d at 492-95. Third, parties of relatively equal bargaining power must negotiate the agreement, for which there is consideration. *Wagenblast*, 110 Wn.2d at 854-55. A party should be allowed to decline the release for consideration. *Wagenblast*, 110 Wn.2d at 855. The agreement must not be a contract of adhesion.[6] No single one of these factors alone should be determinative of fairness in the bargaining process.

2. Substance of the Agreement

Once the court determines the parties fairly negotiated the agreement, the court should consider the substance of the pre-injury release agreements and assess whether the agreement is consistent with public policy. Washington law has recognized that public policy may outweigh the traditional freedom to contract in a pre-injury release agreement. For example, we have indicated the invalidity of pre-injury release agreements imposed on employees by employers (*Wagenblast*, 110 Wn.2d at 850 (*citing* Restatement (Second) of Torts § 496B, cmt. *f* (1965))); on bailors by public bailees (*Althoff v. System Garages, Inc.*, 59 Wn.2d 860, 371 P.2d 48 (1962); *Sporsem v. First Nat'l Bank*, 133 Wash. 199, 233 P. 641, 40 A.L.R. 854 (1925)); on customers

---

[6]"The factors considered in the determining whether a contract is an adhesion contract are (1) whether the contract is a standard form printed contract, (2) whether it was 'prepared by one party and submitted to the other on a "take it or leave it" basis', and (3) whether there was 'no true equality of bargaining power' between the parties. *Standard Oil Co. v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965)[.]" *Yakima County*, 122 Wn.2d at 393.

by public utilities (*Reeder v. Western Gas & Power Co.*, 42 Wn.2d 542, 256 P.2d 825 (1953)); on customers by common carriers (*Carstens Packing Co. v. Southern Pac. Co.*, 58 Wash. 239, 108 P. 613 (1910); *S.S. Kresge Co. v. Port of Longview*, 18 Wn. App. 805, 573 P.2d 1336 (1977)); on students by public schools (*Wagenblast*, 110 Wn.2d at 856-59); and on tenants by landlords (*Thomas v. Housing Auth.*, 71 Wn.2d 69, 426 P.2d 836 (1967); *McCutcheon v. United Homes Corp.*, 79 Wn.2d 443, 486 P.2d 1093 (1971)).

The Restatement (Second) of Contracts § 195 (1981) discusses public policy grounds for invalidating pre-injury release agreements and states:[7]

(1)    A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

(2)    A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty; or

(c) the other party is similarly a member of a class protected against the class to which the first party belongs.

(3)    A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.

The Restatement criteria are sound and fair, and generally comport with Washington law. We should adopt the Restatement (Second) of Contracts § 195, and the persua-

---

[7]The Restatement (Second) of Contracts § 195(1) (1981) forbids the release of reckless conduct, where the Restatement (Second) of Torts § 496B (1965) does not.

sive authority arising under it, for the analysis of public policy in the context of pre-injury release agreements.

CONCLUSION

While I concur in the majority's disposition of this case, pre-injury release agreements should be enforced if they are procedurally fair and appropriate on substantive grounds. The separation of procedural and substantive facets of the enforcement of pre-injury release agreements, as well as a more careful delineation of the public policy grounds for defeating such agreements, would provide a much-needed, improved analytical framework for assessing the enforceability of release agreements.